BRANDON J. HARRISON, Judge
The issue here is whether methamphetamine was present in Mark Norris's body when he was injured at work so that his employer and its insurance carrier are entitled to receive a rebuttable presumption that the workplace injury was substantially occasioned by the drug. The Arkansas Workers' Compensation Commission (Commission) answered no, and Norris's employer and its insurance carrier appeal that decision. We hold that substantial evidence supports the Commission's decision. We also affirm the Commission's award of temporary total-disability (TTD) benefits.
I. The Accident and Its Aftermath
National Transit Staffing employed Norris as a truck driver and tasked him to carry a load from a Van Buren nursery to *733 a St. Louis facility on 4 June 2015. Norris injured himself at the nursery loading dock during the early morning hours. His left hand apparently became wedged between two plates in a hydraulic lift. Within a few minutes of the accident, Norris freed himself, phoned a friend for directions to a nearby hospital, and drove himself there. Medical personnel at Summit Hospital in Van Buren evaluated Norris, concluded that repairing his crushed-thumb injury was beyond their capabilities, and sent him by ambulance to UAMS in Little Rock. Medical records from the Van Buren hospital visit noted that his thumb was crushed between two metal plates. The records also report that Norris appeared to be uncomfortable and that he was "anxious, appropriate for age, cooperative." At 4:26 a.m., Norris's pain was a "10 out of 10." At 4:41 a.m., Norris was given Dilaudid (a strong pain medicine) and Zofran (anti-nausea medicine) intravenously. Norris left the emergency department around 7:20 a.m.
The paramedic report from the ambulance trip between Van Buren and Little Rock stated that Norris had reported that he caught his thumb between two pieces of sheet rock, and the doctor reported that the bones in Norris's thumb were shattered. The paramedic report also stated that Norris reported his pain level to be "at 2 at this time" and that he had been given Dilaudid and Zofran before the ambulance arrived in Little Rock. While traveling to UAMS, Norris started experiencing pain that was 10 on a scale of 1 to 10. He was given fentanyl (a strong opioid), which reduced his pain to 2 out of 10.
Once at UAMS, Norris was evaluated and given morphine and Zofran at 10:34 a.m. At 10:54 a.m., Norris consented to surgery, which was done that day around 1:00 p.m., using a regional anesthesia. Norris was discharged the next day.
UAMS emergency-department physician Dr. Delany L. Kinchen noted, "Psychiatric: He has a normal mood and affect. Judgment and thought content normal. Very bizarre affect." Dr. Theresa O. Wyrick, an orthopedic surgeon who amputated Norris's thumb, stated in her preoperative and postoperative diagnoses that Norris suffered "[a]cute methamphetamine use." Other records from UAMS indicate that Norris admitted "recreational drug use, methamphetamine every month or two" and that "[p]atient states he smoked and injected 'go fast' (methamphetamine) within the last 24 hours-he appears somewhat intoxicated."
While recovering back home in Huntington, Arkansas, Norris signed a notice-of-injury form on 10 June 2015 and wrote this account of the accident:
It was 2 a.m. dark behind little truck went to close rear door, kept open to get air to plants. I hit button on rear truck tail gate lift thing snapped so quick chain got left hand pinned it till I could get it loose.
National Transit Staffing and its insurance carrier initially paid a short period of temporary total-disability benefits and medical treatment before disputing the claim entirely.
During the administrative hearing on the disputed claim, Norris described what happened in the emergency room this way:
Oh, the first thing off the bat, they cut off the glove. And then when, you know my thumb fell out, it was all exploded and in pieces. You could see like the bones in your hand because it was all cut open. They just immediately started giving me, I guess, pain medicine.
He described being in and out of consciousness during the ambulance ride to Little Rock. He remembered "bit and pieces" of the discussions he had with the *734 anesthesiologist who asked him about his drug use because "you could have a heart attack and stuff." He did not recall telling a doctor that he had used methamphetamine. According to Norris, he was "so delirious and just in and out so much." Norris denied using methamphetamine within a week of the accident.
On cross-examination, the following colloquy occurred:
DEFENSE COUNSEL : So how long have you been doing methamphetamine, Mr. Norris?
NORRIS : Like I told you the last time, gosh, I've partied a few times a year. I am not quite sure.
DEFENSE COUNSEL : Before this accident happened, you had been a methamphetamine user; had you not?
NORRIS : Yes, I have done it, yes.
DEFENSE COUNSEL : But on this particular night, you are saying that you did not use it, correct?
NORRIS : Yes.
....
DEFENSE COUNSEL : [Y]ou told the anesthesiologist that you used go-fast meth, that you both smoked it and injected it within 24 hours. You told him that, didn't you, sir?
NORRIS : I don't remember.
....
DEFENSE COUNSEL : I asked you at your deposition why you would use methamphetamine and you told me, did you not, sir, because it would make you feel awake? Is that a fair statement?
NORRIS : Yes.
DEFENSE COUNSEL : Also, it would make you go fast. Isn't that also true?
NORRIS : Yes, it is possible.
....
DEFENSE COUNSEL : And you told me that when you used meth that you could definitely feel its effects for six to eight hours; is that correct?
NORRIS : Possibly, yes.
DEFENSE COUNSEL : So what you did on this particular evening, isn't it true, Mr. Norris, that you used some meth anticipating you were going to have a six-hour drive to St. Louis and you did it before you went to the Parka Farm to pick up the truck; isn't that true? NORRIS : No, I don't think so.
Norris's brother, Luke, testified that Norris called him the morning the accident happened. He thought Norris was playing a joke on him about his thumb because he sounded drunk or drugged. Eventually Luke realized that Norris was serious, so he called National Transit Staffing and told them that Norris wouldn't make his shift because he lost his thumb and "they've got him on an IV and they are going down to Little Rock to check it out." Luke denied knowing that his brother had ever used methamphetamine.
While being questioned about something Norris had said in his deposition, Norris replied yes to the question: "You are asking this Judge to believe that you told the anesthesiologist at UAMS about some gathering you had been at three days before with other friends where they were doing meth and that is the story that you are asking this Judge to believe today?" He also agreed with the statement, "[Y]ou have no idea how the history got in there about doing go-fast meth, not only smoking it, but injecting it within 24 hours? You have no idea how that history got in there."
*735 II. The Commission's Decision
The Commission found that the June 4 accident was not substantially occasioned by the use of illegal drugs. Part of that decision touches a statutory-presumption issue, which is that because the employer did not establish "the presence of" illegal drugs in Norris's body, the rebuttable statutory presumption was not triggered. The crux of our dissenting colleagues' point is that the Commission erred in failing to apply the presumption and shift the burden to Norris to establish that the presence of methamphetamine was not a sufficient causal factor in the work injury.
The Commission acknowledged Norris's testimony that he had occasionally used methamphetamine before the injury. Norris was an experienced driver for National Transit Staffing, and the record does not show any previous indication that drug use had affected his work or that he had been tested or disciplined for drug use. The Commission noted that Norris had the presence of mind to obtain directions and drive himself to the nearest hospital. The medical providers at Summit Medical Center did not report any symptoms of intoxication from alleged methamphetamine use at the time of the accident, and the medical records corroborated Norris's side of the story.
The Commission also noted that the initial medical reports at UAMS corroborated Norris's testimony: "Pt. here for crushing injury by metal object (tail gate to back of truck) to left hand onset 0300 this morning." And it reasoned that if Norris really had exhibited a "bizarre affect" the morning of June 4, then it could have "easily" been related to the postinjury pain medications administered-which included fentanyl and morphine-and Zofran, an anti-nausea medication. It concluded that there was "no probative evidence demonstrating that claimant's alleged 'bizarre affect' was causally related to methamphetamine use." No urine specimen, blood sample, or hair-follicle test was collected, so no chemical analysis supported Dr. Wyrick's "uncorroborated diagnosis of [a]cute methamphetamine use." The Commission also found that no physical evidence corroborated Dr. Wyrick's diagnosis of acute methamphetamine use. While acknowledging certain statements in UAMS medical records-"Patient states he smoked and injected 'go fast' (methamphetamine) within the last 24 hours" and "[Norris] admits to doing methamphetamine within the last 24 hours to the anesthesiologist. He seems to be acutely intoxicated in our estimation related to that"-the Commission did not credit them. "The claimant expressly denied having methamphetamine in his system at the time of the accident, and there is no substantive evidence of record contradicting the claimant's testimony other than hearsay notes entered at UAMS."
The Commission awarded Norris medical-treatment benefits, finding that he proved he sustained a compensable injury, by medical evidence supported by objective findings, including a crush injury and degloving to the bone. It further held that Norris had not returned to work since the compensable injury, and no treating physician had stated that he had reached the end of his healing period. The Commission therefore awarded Norris TTD benefits from 4 June 2015 to a date yet to be determined.
III. Presence of Illegal Drugs?
National Transit Staffing and Triangle Insurance Company's first two points on appeal are interrelated. They argue that the presence of illegal drugs was established when Norris admitted methamphetamine use and that the Commission mistakenly disregarded the "objective medical *736 records" as hearsay, so the Commission erred by not applying the rebuttable presumption as a matter of law. They also argue that Norris's admission of methamphetamine use and the medical records establish the presence of methamphetamine and that the accident was substantially occasioned by the use of that drug. For these reasons, substantial evidence does not support the Commission's decision. Norris disagrees.
We must view the evidence in the light most favorable to the Commission's decision and affirm the decision if it is supported by substantial evidence. Prock v. Bull Shoals Boat Landing , 2014 Ark. 93, 431 S.W.3d 858. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. Id. The issue is not whether this court might have reached a different result from the Commission, but whether reasonable minds could reach the Commission's result. Id. Questions concerning the credibility of witnesses and the weight to be given to their testimony are decided by the Commission. Id. When the evidence conflicts, the Commission resolves them and determines the facts. Id. Finally, we will not reverse the Commission's decision unless convinced that fair-minded persons, with the same facts before them, could not have reached the Commission's conclusions. Id.
Under Arkansas law, a workplace injury is not compensable if it is substantially occasioned by "the presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's order." Ark. Code Ann. § 11-9-102(4)(B)(iv)(a) (Repl. 2012); ERC Contractor Yard & Sales v. Robertson , 335 Ark. 63, 71, 977 S.W.2d 212, 216 (1998) (explaining that "substantially occasioned" means that there must be a direct causal link between the use of alcohol or illegal drugs and the injury or accident). In other words, an employer has an affirmative defense against a benefit claim if it can prove by a preponderance of the evidence that an intoxicating (or misused) substance is to blame for the injury. Weld Rite, Inc. v. Dungan , 2012 Ark. App. 526, at 7, 423 S.W.3d 613, 617.
Our supreme court has interpreted § 11-9-102(4)(B)(iv) this way:
Once evidence is admitted showing that such drugs were in the claimant's system at the time of the accident, the burden of proof shifts to the claimant, requiring him to prove by a preponderance of the evidence that the accident was not substantially occasioned by intoxication from one of these substances.
Prock , 2014 Ark. 93, at 12, 431 S.W.3d at 867. A positive drug test triggers the rebuttable presumption. Id. The presumption can also arise, in the absence of a positive drug test, if the evidence adequately supports the inference that an employee had "[t]he presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's orders" in his or her body when injured. Id. ; Ark. Code Ann. § 11-9-102(4)(B)(iv)(b) . The case Flowers v. Norman Oaks Constr. Co. , 341 Ark. 474, 17 S.W.3d 472 (2000) is an example of the second path to the presumption. There, the presence of alcohol was not detected using a chemical test; instead, the strong smell of alcohol and evidence of habitual drinking sufficed. Id.
Under decades-old law, the Commission decides how to credit and weigh testimony and other evidence when it is open to more than one interpretation. And when the Commission makes its determination, its findings have the force and effect of a jury verdict. Id. at 2, 423 S.W.3d at 615. This well-known legal principle of appellate review, which we employ as a *737 court almost weekly, means that when the evidence conflicts-as it most assuredly does here-a finding by the Commission that drugs or alcohol were not present must be affirmed if it is supported by substantial evidence. Hunter Wasson Pulpwood v. Banks , 270 Ark. 404, 605 S.W.2d 753 (1980) (applying standard of review) ; Black v. Riverside Furniture Co. , 6 Ark. App. 370, 642 S.W.2d 338 (1982) (same).
Does substantial evidence support the Commission's decision that National Transit Staffing failed to establish the presence of an illegal drug (methamphetamine)? Yes. Our standard of review impels this conclusion. No direct evidence (like a chemical-assay result) put methamphetamine in Norris's system when the accident occurred. As the Commission noted, no urine, blood, or hair-follicle test was even administered. So the presumption was not triggered by a positive test, as has been the case before. E.g. , Prock , supra ; Hickey v. Gardisser Constr. , 2009 Ark. App. 725, at 2, 377 S.W.3d 259, 261 (drug screen tested positive for methamphetamine). A positive drug-screen result is not required to trigger the statutory presumption. The basic point is merely that the Commission lacked objective scientific evidence in this case that Norris had, in fact, ingested methamphetamine around the time the injury occurred.
Another clarification is warranted here so that we cannot be reasonably misunderstood. Just as we are not holding that a positive drug screen is required to trigger the statutory presumption, we are not holding that an employer must prove that an employee was "actually intoxicated" when an injury occurs, for want of a more precise phrase, before the presumption applies. That is not the law either. Our conclusion is solely based on the Commission's role as fact-finder and its authority to make reasonable inferences from the evidence before it. The Commission read the documentary and testimonial evidence that the parties presented and made a final decision on whether the employer sufficiently established "the presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's order." Ark. Code Ann. § 11-9-102(4)(B)(iv)(b) . It bears repeating in this close case that the issue is not whether this court could have reached a different result; the legal standard probes only whether reasonable minds could have reached the Commission's conclusion. If so, then we affirm its decision. Jones v. Wal-Mart Stores, Inc. , 100 Ark. App. 17, 20, 262 S.W.3d 630, 633 (2007).
That is the case here. Yes, a conclusion contrary to the one the Commission made in this case is conceivable; the dissenters make this point well, as they reweigh and cross-examine all the evidence and credit this piece over that one and tally the total in favor of Norris's employer and against him. They step outside our standard of review, however, by doing so.
We agree with the dissent that this court is not a rubber stamp. But a close call on a conflicted record does not a rubber stamp make. Having considered the whole record and with our standard of review in mind, we hold that the Commission did not commit a reversible error when it decided that "the accident occurring June 4, 2015 was not substantially occasioned by the use of illegal drug." No drug or drug paraphernalia was found on Norris's person, for example. Nor was there any other tangible physical clue that he had ingested methamphetamine. The Commission could have reasonably read Norris's hearing testimony as a disavowal that he had ingested methamphetamine near the time he was injured. The Commission could have reasonably read the *738 entire history of the medical trauma as tending not to establish that Norris had "the presence of" methamphetamine in his body when he was injured.
Our dissenting colleagues rightly note that Norris may have told medical personnel that he had used methamphetamine within twenty-four hours of the injury and that a regional pain block was used instead of general anesthesia, presumably because of that disclosure. But no medical personnel were questioned about what Norris supposedly said. The record, for example, contains no testimony by the surgeon or anesthesiologist.
The dissent correctly notes that the Commission was not bowled over by this part of the medical record, in part, because it was an "unsubstantiated hearsay report," in the Commission's words. The characterization of this medical evidence is more akin to a party admission or statements given while seeking medical treatment. Ark. R. Evid. 801(d)(2) & 803(4). But in the end, the Commission is not bound by technical or statutory rules of evidence. See Linthicum v. Mar-Bax Shirt Co. , 23 Ark. App. 26, 30, 741 S.W.2d 275, 277 (1987) ; Ark. Code Ann. § 11-9-705(a)(1). The core question is whether the Commission arbitrarily disregarded the evidence, and we do not believe that it did.
Again, the Commission did what it was supposed to do: it weighed and resolved conflicting evidence-the conflict being Norris's admission to his doctor that he had used methamphetamine within twenty-four hours of the accident (assuming it was in fact said and was accurately charted by medical personnel), and then later denying under oath during the administrative hearing that he had used the drug during a time frame that mattered to the case. It was up to the Commission to weigh and interpret the various medical records themselves, from the time of Norris's initial presentation up to and including his surgery.
The Commission did not err, which is to say that it did not act unreasonably, by concluding that "the evidence does not demonstrate the presence of any illegal drugs in the claimant's system at the time of the June 4, 2015 accidental injury." The Commission did not require the employer to prove that Norris was under the influence of drugs when injured. That would have been an error. It simply concluded, on a conflicted record, that National Transit Staffing failed to establish "the presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's orders" as Ark. Code Ann. § 11-9-102(4)(B) requires be done by a preponderance of the evidence. Because we believe a reasonable mind could have reached that conclusion depending on how one weighs and credits all the evidence, we affirm the Commission's decision.
IV. Other Points
Appellants also argue that there is no substantial evidence to support the Commission's finding that Norris sustained his left-thumb injury at work because the only indication that Norris arrived at work that day was his own self-serving testimony. That a claimant's testimony is self-serving is not, for that reason alone, insufficient to support a finding in his or her favor. See Brantley v. Tyson Foods, Inc. , 48 Ark. App. 27, 31, 887 S.W.2d 543, 545 (1994). The Commission as fact-finder was entitled to credit Norris's testimony that he arrived at the nursery between 2:00 a.m. and 3:00 a.m., that he was preparing the truck for the run up to St. Louis, that he was lowering the lift to shut the truck door, and that his left thumb was crushed in the process. We see no error.
*739 Second, the appellants argue that the Commission erred because it shifted the burden of proof to them to show that Norris's healing period had ended. Under Arkansas law, to receive TTD benefits the claimant must prove by a preponderance of the evidence that he or she is within the healing period and is totally incapacitated from earning wages. Ark. Dep't of Parks & Tourism v. Price , 2016 Ark. App. 109, at 10, 483 S.W.3d 320, 326. The Commission wrote:
After reviewing the entire record de novo, the Full Commission finds that the claimant proved he sustained a compensable injury. The record currently before us shows that the claimant has not returned to work since the June 4, 2015 compensable injury and no treating physician has opined that the claimant reached the end of his healing period. The Full Commission therefore finds that the claimant proved he was entitled to temporary total disability benefits beginning June 4, 2015 until a date yet to be determined.
We do not think the Commission shifted the burden of proof to the employer-carrier using these words. See High Capacity Prods. v. Moore , 61 Ark. App. 1, 8, 962 S.W.2d 831, 835 (1998). So we affirm on this subpoint, too.
As their final point, the appellants argue that the TTD award is not supported by substantial evidence. A temporary total disability occurs when a claimant is within his or her healing period and also suffers a total incapacity to earn wages. The healing period continues until the employee is restored as much as the permanent character of his or her injury will permit; the healing period ends when the underlying condition that caused the disability is stabilized and no additional treatment will improve the condition. Farmers Coop. v. Biles , 77 Ark. App. 1, 5, 69 S.W.3d 899, 902 (2002). The Commission determines as a matter of fact when the healing period has ended. Its decision will be affirmed on appeal if supported by substantial evidence. Id.
On Norris's direct examination, this colloquy occurred:
COUNSEL : [S]ince being treated at UAMS and release, my understanding is that you saw Dr. James Kelly, the hand doctor here?
NORRIS : Yes, sir.
COUNSEL : And is he still treating you currently?
NORRIS : Yes. I finally got some Medicaid insurance and when he seen me, he told me the four options that I could do. COUNSEL : And one of them was taking off your big toe and putting it on your thumb?
NORRIS : My second toe.
COUNSEL : And is that something you are considering at this point?
NORRIS : Yes. I would like to get use of this hand again, you, for gripping purposes. It is kind of useless, you know.
COUNSEL : And you would like the Judge to find the claim compensable?
NORRIS : Yes.
COUNSEL : You would like to be paid for being off work?
NORRIS : Yes.
When asked if he had any contact with his employer after the accident, Norris said he went to its office, filled out paperwork, and took a drug test about six to seven days after he had been released from the hospital. He said that whether he still had a job never came up, that he was later told that the claim was disputed given his statement about methamphetamine, and that he had not worked anywhere *740 since. There is no testimony that Norris was totally incapacitated from earning wages, though Norris testified that he had not worked anywhere since the accident.
This means he had to still be within a healing period to get TTD benefits. Ark. State Highway & Transp. Dep't v. Breshears , 271 Ark. 398, 398, 609 S.W.2d 81, 82 (Ark. Ct. App. 1980) (Although the claimant could work at a time before the end of his healing period, TTD benefits may continue until the healing period ends.). Regarding the healing period, as the Commission found, no doctor concluded that Norris had reached the end of his healing period or had reached maximum medical improvement. In fact, no doctor used the term "healing period." The Commission viewed this silence in Norris's favor. It also knew that Norris had testified that he was still being treated by Dr. Kelley for his injury and that he may need to have a toe placed on his hand to make his hand more useful. All this is "substantial evidence" that Norris was within his healing period when the hearing occurred, though it strains the term's definition. The TTD award is therefore affirmed.
Affirmed.
Klappenbach, Whiteaker, and Brown, JJ., agree.
Virden and Hixson, JJ., dissent.